UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GAYLAND BRION COLES,                          Case No. 13-14450

          Plaintiff,                         Gerald E. Rosen
v.                                            United States District Judge

DEARBORN MIDWEST CO., *et al*,                Michael Hluchaniuk
                                              United States Magistrate Judge
          Defendants.
_____/

**REPORT AND RECOMMENDATION
CROSS-MOTIONS FOR SUMMARY JUDGMENT
AND MOTION FOR SANCTIONS (Dkt. 29, 40, 50)**

## I.   PROCEDURAL HISTORY

Plaintiff filed this *pro se* employment civil rights action on October 23,

2013.  (Dkt. 1).  Defendants filed an answer to the complaint on November 13,

2013.  (Dkt. 6).  On December 23, 2013, District Judge Gerald E. Rosen referred

this matter to the undersigned for all pretrial proceedings.  (Dkt. 15).  On April 2,

2014, defendants filed their motion for summary judgment.  (Dkt. 29).  Plaintiff

filed a response on April 29, 2013 and defendants filed their reply on May 21,

2014.  (Dkt. 39, 43).  On May 9, 2014, plaintiff filed his motion for summary

judgment.  (Dkt. 40).[1]  On June 19, 2014, defendants filed their response.  (Dkt.

_____

[1] Plaintiff also filed additional supporting materials, which can be found at Dkt. 42 and
Dkt. 51.

58).  Plaintiff's reply (Dkt. 63) was stricken as improperly filed.  (Dkt. 82).  The

Court accepted Dkt. 72 as plaintiff's modified reply brief.  (Dkt. 82).  Finally,

defendants filed a motion for Rule 11 sanctions on June 4, 2014.  (Dkt. 50).

Plaintiff filed three separate responses on June 16, 2014 and July 31, 2014.  (Dkt.

57, 74, 77).  Defendants filed a reply on July 21, 2014.  (Dkt. 69).

 These matters are now ready for report and recommendation.  For the

reasons set forth below, the undersigned **RECOMMENDS** that defendants'

motion to dismiss or for summary judgment be **GRANTED**, that plaintiff's motion

for summary judgment be **DENIED**, and that defendants' motion for Rule 11

sanctions be **DENIED**.

## II.    FACTUAL BACKGROUND

 Plaintiff was hired by Defendant Dearborn Mid-West Company (DMW) on

March 26, 2012, into the position of Fabricator 2.  (Dkt. 29-2, Coles dep, p. 38).

He remained employed in that classification after this lawsuit was filed.[2]

According to DMW, this position is covered by a labor contract between DMW

and Shopmen's Local Union 508 (Union).  (Dkt. 29-4, Labor Contract; 29-5,

Employee Manual).  These labor contracts specify rates of pay for the covered job

classifications, seniority, managerial rights, etc.  They also contain an internal

---

 [2]  Plaintiff was subsequently terminated by DMW during the pendency of this lawsuit.
Claims arising from his termination are not part of this lawsuit.  (Dkt. 94).

dispute resolution procedure for challenging any alleged violations of the labor contract.

When he was hired, Coles was issued an employee manual (Dkt. 29-5), which contains various Company policies.  During his deposition, Coles acknowledged that he is bound by those policies.  (Dkt. 29-2, Coles dep, pp. 37-38).  In the Complaint, Coles alleges the DMW unlawfully breached the M-2 policy, which is part of this manual.  DMW points out that this manual expressly disclaims any contractual obligations/rights.  (Dkt. 29-5, § 1-1).

Coles also claims that one of his supervisors, defendant Willie Mitchell (Mitchell), who also is a black male, referred to him as "Elder Coles" at some point in 2012.  (Dkt. 29-2, Coles dep, pp. 43-45).  Coles interpreted this as a reference to his age, while Mitchell told Coles his reference was to Coles being a "prophet." (Dkt. 29-2, Coles dep, pp. 46, 48-49).  According to his testimony, Coles did not object to Mitchell's reference on the first two occasions he said this to him.  (Dkt. 29-2, Coles dep, p. 48).  Coles also says that on another occasion, Mitchell told Coles to let a "young buck" perform a particular job task and also referred to him in this same conversation as "Elder Coles."  (Dkt. 29-2, Coles dep, pp. 47-48).  Coles said that Mitchell's reference to "young bucks" was directed at Cole's race because that's what "white men will call African-American men" and because "Will represents white men more than he do blacks."  (Dkt. 29-2, Coles

3

dep, pp. 50-51).  Coles says that on this occasion, he told Mitchell that he did not want Mitchell to refer to him as "elder."  (Dkt. 29-2, Coles dep, p. 47).  Coles subsequently complained to DMW in January 2013 about Mitchell's remarks and, according to plaintiff's deposition testimony, there never was a recurrence involving such remarks.  (Dkt. 29-2, Coles dep, p. 172).

On July 16, 2012, Coles filed a grievance under the labor contract,  alleging that a first line supervisor, defendant Mike Johnson (Johnson), had made remarks to which he objected.  (Dkt. 29-6).  In his grievance, Coles alleged that Johnson had called him a "lazy SOB," had said he wished Coles "had a tight (A) [meaning "ass"] and had nice tits to go with that" and another occasion said "you're doing an excellent job, boy" and told Coles after he had asked for some equipment, "the B [meaning "bitch"] wants everything."  *Id*.  Coles spoke to Human Resources Director, defendant Kelly Schafer (Schafer), by telephone about the matters listed in his grievance, (Dkt. 29-2, Coles dep, p. 52), and subsequently withdrew his grievance on July 17, 2012.  (Dkt. 29-7).  Johnson never made any other allegedly objectionable comments to Coles until August 2012 when, on one occasion, Coles asked Johnson for some staples and Johnson said "bitch, bitch, bitch, bitch."  (Dkt. 29-2, Coles dep, p. 54).  According to Coles' deposition testimony, Johnson made no other comments Coles considered to be unlawful.  (Dkt. 29-2, Coles dep, p. 55).

4

Coles claims that on December 5, 2012, a co-worker, who also is a Fabricator 2, Paul Chiado (Chiado), began "humping" him while they were together in the men's room. Coles reported this shortly afterwards to Mitchell but Coles does not recall Mitchell's response. (Dkt. 29-2, Coles dep, pp. 55-58). The next day, Mitchell and Johnson met with Coles and asked him if he wanted Chiado fired. Coles said he did not and just wanted them to speak to Chiado. They said they would do so. Chiado never had any physical contact with Coles subsequently. (Dkt. 29-2, Coles dep, pp. 59-60). Plaintiff testified that sometime in April 2013, Chiado and Coles were talking about the lottery and Chiado said if he, Chiado, won the lottery he would give all but $2 million to Coles if he, Coles, went to the hotel with him. (Dkt. 29-2, Coles dep, p. 63). Coles did not ask Chiado what he meant by this remark. (Dkt. 29-2, Coles dep, p. 64). Coles told Chiado he would report Chiado to management if Chiado didn't knock it off. (Dkt. 29-2, Coles dep, p. 66).

Coles reported Chiado four months later in August 2013, when another "event" occurred. (Dkt. 29-2, Coles dep, p. 67). Coles says that sometime in August 2013, Chiado asked Coles if he was "going to think of" Chiado while he was on his boat. In response, Coles called Chiado a "fag." (Dkt. 29-2, Coles dep, p. 67). Coles then relayed this exchange to his union steward, Calvin Logan. (Dkt. 29-2, Coles dep, pp. 67-68). On August 31, 2013, Coles reported Chiado's

5

"boat" remark to Mitchell. Coles also told Mitchell that he had called Chiado a "fag." Mitchell then told Coles he, Mitchell, was going to have a meeting to see what was going on. (Dkt. 29-2, Coles dep, pp. 110-111). Later that day, August 31, 2013, Coles and several union representatives met with Mitchell. Mitchell advised Coles that he could be terminated for calling Chiado a "fag." (Dkt. 29-2, Coles dep, p. 113). Coles then told Mitchell that back in May 2013, Chiado said to Coles "that line is crooked as fuck boy." (Dkt. 29-2, Coles dep, pp. 114-115). Mitchell told Coles the word "boy" didn't mean anything. (Dkt. 29-2, Coles dep, p. 114).

When he was asked why he thought Johnson's lazy remark was race-based, Coles said that's how white men consider black men. (Dkt. 29-2, Coles dep, pp. 71-72). When he was asked if Johnson was joking when he made the remark about "ass" and "tits", Coles said he didn't know. (Dkt. 29-2, Coles dep, p. 74). When he was asked why he thinks Johnson's use of the word "boy" referred to his race, Coles concluded it was because the word has racial overtones. (Dkt. 29-2, Coles dep, p. 69). When he was asked why he objected to Johnson saying "the bitch wants everything" Coles said it was a homosexual based remark because he was "born to be a man, born to die a man." (Dkt. 29-2, Coles dep, p. 75).

Coles testified that his defamation claim is solely based on his allegation that someone (whom he cannot identify) wrote "faggit queer" on his January 26,

2013 time sheet.  These sheets are kept in a rack and are accessible to anyone in the shop.  (Dkt. 29-2, Coles dep, pp. 78-79, 187).  Coles believes this notation was in retaliation for his complaint to the Company CEO, defendant Anthony Rosati (Rosati) because it occurred after his complaint.  (Dkt. 29-2, Coles dep, p. 81).  Coles believes DMW should have hired a handwriting expert to track down the responsible person but he never said that to the Company.  (Dkt. 29-2, Coles dep, p. 81).

Coles also described remarks from some of his co-workers that he believes are unlawfully age-based.  Examples plaintiff gave include one employee telling Coles he is "over the hill;" he is "one nail closer to his coffin;" and "old people are stuck in their ways."  (Dkt. 29-2, Coles dep, pp. 84-90).  Coles also alleged that other younger employees were allowed to violate DMW's attendance policy without consequences.  However, Coles also testified that he did not keep track of other employees' attendance nor does he know if any absences/tardies were excused or unexcused per DMW's policies.  (Dkt. 29-2, Coles dep, pp. 102-103).

Coles also alleged throughout his Complaint that he was given work tasks or denied training (for a Fabricator 1 position) because he had complained about alleged co-worker misconduct.  These chiefly consist of not being allowed to train to become a Fabricator 1 and not being assigned to work on a laser machine.  When he was asked about these claims, Coles admitted at his deposition that he

has no evidence to support them. And, while he alleged in his complaint that he was taken off welding tasks, he testified at his deposition that he performs welding over 50% of the time. (Dkt. 29-2, Coles dep, p. 189). At the time of his deposition, Coles was also working alongside a Fabricator 1, which is necessary to become one. (Dkt. 29-2, Coles dep, p. 136).

After he was hired, sometime in October 2012, Coles spoke to Mitchell, only, about obtaining a position where he could earn more money. (Dkt. 29-2, Coles dep, pp. 100-101). Coles understood, following his discussion with Mitchell, that he would have to become a Fabricator 1 to earn more money. (Dkt. 29-2, Coles dep, p. 101). There is no formal apprenticeship process to go from a Fabricator 2 to Fabricator 1. Only working with a Fabricator 1 is required. (Dkt. 29-2, Coles dep, pp. 105-106). A Fabricator 2 is assigned different work tasks after indicating his interest in becoming a Fabricator 1. That process can take longer for some than for others. (Dkt. 29-2, Coles dep, pp. 107-108). One cannot become a Fabricator 1 just by operating a laser machine. (Dkt. 29-2, Coles dep, p. 148). Coles testified that he began training with a Fabricator 1 in July 2013. (Dkt. 29-2, Coles dep, p. 133). Coles claims this training was halted about three months later on October 2, 2013, when Mitchell assigned him to perform certain welding work. (Dkt. 29-2, Coles dep, p. 133). Mitchell did not tell Coles his Fabricator 1 training was stopped but Coles concluded that it was because he was assigned to

8

do welding work then.  (Dkt. 29-2, Coles dep, p. 135).  According to Coles, he has been doing welding work about 50% of the time since October 2, 2013.  (Dkt. 29-2, Coles dep, p. 189).

Coles also testified that, at the time of his deposition, he was working with a Fabricator 1.  (Dkt. 29-2, Coles dep, p. 136).  He testified he does not know if the DMW considers this to be part of Fabricator 1 training.  (Dkt. 29-2, Coles dep, p. 137).  According to the declaration of Kelly Schafer, working with a Fabricator 1 is part of the Fabricator 1 training.  (Dkt. 29-8).  Coles contends, however, that on October 2, 2013, his Fabricator 1 training stopped because of his August 31, 2013 complaint about Chiado.  According to Coles, the evidence supporting this claim is his "removal" after his complaint.  (Dkt. 29-2, Coles dep, pp. 137-138).  Coles also testified he has no reason to dispute that Mitchell assigned him welding work because he is better than others at it.  (Dkt. 29-2, Coles dep, p. 136).  He also testified that he has never discussed Fabricator 1 training with any supervisor since his alleged "removal" on October 2, 2013.   (Dkt. 29-2, Coles dep, p. 191).  Notably, when asked why he says he was assigned menial tasks, Coles testified that he was required to do jobs that others in his same classification had to perform.  (Dkt. 29-2, Coles dep, p. 156).  He acknowledged that under the labor contract, management assigns work tasks and that performing "menial tasks" is just "part of employee's duties."  (Dkt. 29-2, Coles dep, pp. 156-157).  Despite

these acknowledgments, Coles claims he was required to perform certain job tasks as "retaliation" for his report of discrimination because these assignments occurred afterwards. (Dkt. 29-2, Coles dep, p. 157).

Coles alleges throughout his Complaint that co-workers made other remarks he interpreted as racial slurs. However, Coles testified that he never reported these alleged comments to the Company. (Dkt. 29-2, Coles dep, pp. 163-166; 188). According to Coles, he was "precluded" from making additional reports to Schafer because she is/was "racist." (Dkt. 29-2, Coles dep, pp. 179-180). When asked why he says Schafer gave "racist support," as alleged in ¶ 74 of his Complaint, Coles said his allegation is based on Schafer telling him she knew Chiado personally and the fact that other objectionable comments occurred later. (Dkt. 29-2, Coles dep, pp. 179-180). However, Coles also acknowledged that every time he complained to Schafer, she discussed his concerns with him. (Dkt. 29-2, Coles dep, p. 174). He also admitted that Schafer never told him not to bring any complaints to her and that Schafer never did or said anything that led Coles to believe she would not consider fairly any complaints he brought to her. (Dkt. 29-2, Coles dep, p. 175). Plaintiff also admitted he does not even know what actions were taken by the Company in response to his complaints. (Dkt. 29-2, Coles dep, p. 169). Coles testified that he was notified in writing that the complaint he made on January 23, 2013 was investigated by Schafer and he was provided with the

10

results of that investigation, including the corrective action taken.  (Dkt. 29-2, Coles dep, p. 125; Dkt. 29-9).

Coles also claims in ¶ 136 of his Complaint that he was removed from Fabricator 1 training because of alleged objections of other Fabricator 1's to work with him, which he says is just an "excuse."  Coles, however, admitted he was advised that other Fabricator 1s had reported that Coles had been taking photographs of them, and work being performed, in the workplace.  (Dkt. 29-2, Coles dep, p. 196). Coles testified that he took between 20-30 pictures at the workplace and is aware that other Fabricator 1s objected to his picture taking. (Dkt. 29-2, Coles dep, pp. 197-198).  DMW's written policies prohibit such photography without prior permission.  (Dkt. 29-5, § M4-16) and it was this prohibition to which the October 10, 2013 notice from one of his supervisors (Lindeman) attached to the Complaint refers.  (Dkt. 1, Ex. 5, p. 52 of 55).

In addition to the grievance that Coles filed and later withdrew under the labor contract's dispute resolution mechanism, DMW contends that Coles has litigated, or initiated litigation, over the same matters alleged here before the EEOC and the NLRB.  Coles filed a Charge of discrimination with the EEOC on February 25, 2013.  (Dkt. 29-10).  In that Charge, Coles alleged he was sexually harassed by a co-worker (Chiado) in December 2012; that he was assigned to different job duties in February 2013; that a supervisor made sexually harassing

11

comments to him in July 2012 (Johnson's joke about wishing Coles had female anatomy); that someone had written a sexual epithet ("faggit queer") on his time sheet in January 2013; that a supervisor in his 30s (Mitchell) unlawfully referenced his age (by calling him "elder" and telling him to let a "young buck" perform a job task). According to DMW, the EEOC charge was based on the Age Discrimination in Employment Act (ADEA); Title VII of the U.S. Civil Rights Act of 1964 (Title VII); and Michigan's Elliott-Larsen Civil Rights Act (ELCRA) and that Coles subsequently withdrew the charge. The EEOC then issued Coles a Right To Sue Notice. (Dkt. 29-11). DMW maintains that no violation of any of these laws has been alleged in the instant lawsuit.[3]

On March 28, 2013, Coles filed an unfair labor practice charge with the NLRB, alleging he was retaliated against for previously filing grievances about alleged discrimination. (Dkt. 29-12). The NLRB found there was no retaliation for Coles having filed his grievances. (Dkt. 29-13). DMW says that this is significant for two reasons. First, the NLRB made a decision on the merits of Coles' claim that he was retaliated against for filing grievances (concerning most of the same matters he alleges here) and the NLRB found no retaliation occurred. Second, Coles did not appeal the NLRB's ruling.

---

[3] The undersigned observes that the Complaint does not contain any claims under Elliott-Larsen or Title VII, but it clearly mentions the ADEA.

At the time of the filing of this lawsuit, Coles filed a second Charge of Discrimination with the EEOC against DMW. (Dkt. 29-14). He makes the same allegations regarding several matters he brought in his initial Charge and in this lawsuit, in this latest Charge. The EEOC dismissed Coles' charge because it was duplicative of the previous EEOC charge. (Dkt. 29-15).

## III.   ANALYSIS AND CONCLUSION

###   A.   Standard of Review

####     1.   Summary Judgment

Summary judgment is appropriately rendered "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 362 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 282 (2012). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 578 (6th Cir. 2009), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party

13

opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adams v. Hanson*, 656 F.3d 397, 401 (6th. Cir. 2011).

A party asserting that a fact cannot be genuinely disputed must support the assertion as specified in Rule 56(c)(1). Once the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. Fed.R.Civ.P. 56(e)(2), (3); *see Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009), quoting *Anderson*, 477 U.S. at 252; *see also Donald v. Sybra, Inc.*, 667 F.3d 757, 760-61 (6th Cir. 2012).

A moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). The moving party without the burden of proof need only show that the opponent cannot sustain his burden at

14

trial. "But where the moving party has the burden–the plaintiff on a claim for relief or the defendant on an affirmative defense–his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986), quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984). The Court of Appeals has repeatedly emphasized that the party with the burden of proof faces "a substantially higher hurdle" and "'must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Arnett*, 281 F.3d at 561, quoting 11 JAMES WILLIAM MOORE, ET. AL. MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *see Surles v. Andison*, 678 F.3d 452, 455-56 (6th Cir. 2012); *Cockrel*, 270 F.3d at 1056. Accordingly, a summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

        2.    Rule 12(b)(6

Pursuant to Fed.R.Civ.P. 12(b)(6), a party may assert a motion to dismiss an opposing party's claim for relief where there is a failure to state a claim upon which relief can be granted. The inquiry on a motion to dismiss is whether the

complaint sets forth allegations sufficient to make out the elements of a right to relief. *Jackson v. Richards Medical Co.*, 961 F.2d, 575, 577-78 (6th Cir. 1992). Matters outside the pleadings are not to be considered and all well-pleaded facts must be taken as true. *Id.* In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, the court construes the complaint in the light most favorable to the plaintiff, and must determine whether the plaintiff can prove any set of facts that would entitle him to relief. *Alford v. City of Detroit*, 657 F. Supp.2d 847, 851 (E.D. Mich. 2009). While "conclusory allegations or legal conclusions masquerading as factual assertions" are insufficient, all reasonable inferences which might be drawn from the pleadings must be indulged. *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006).

    B.    <u>42 U.S.C. § 1981</u>

    Defendants contend that plaintiff's § 1981 claims must be dismissed because he was not party to a contract with defendants. As DMW points out, the U.S. Supreme Court has held that a § 1981 plaintiff, in the first instance, must be a party to a contract. *Domino's Pizza, Inc. v. John McDonald*, 546 U.S. 470, 475-476 (2006); *Patterson v. McLean Credit Union*, 491 U.S. 164, 176 (1989); *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004). According to DMW, Michigan's federal courts look to Michigan law to determine if a contract has been formed and this body of law specifically provides that employee

16

handbooks identifying employer policies, procedures, etc., and which disclaim a contractual relationship cannot create an enforceable contract between an employer and employee. *Heurtebise v. Reliable Business Computers, Inc.*, 452 Mich. 405; 550 N.W.2d 243 (1996) (such disclaimers "demonstrate[d] that the [employer] did not intend to be bound to any provision contained in the handbook"). And, of course, a valid contract requires an offer, acceptance, consideration, and mutual agreement to all of the contract's essential terms. *Kloian vs. Domino's Pizza, LLC*, 273 Mich. App. 449, 452-53; 733 N.W.2d 766 (2006).

DMW argues that there is no contract between Coles and DMW given that Coles does not even allege a contract or a contractual relationship with him was violated under the prohibitions of § 1981 and because Coles identified the document on which he relies to support his § 1981 claim as a unilateral company policy. According to DMW, that is an accurate characterization and is an admission no contract exists. DMW also points out that its policies expressly disclaim any contract and any rights associated with employment under these policies and they also expressly state that the terms of employment for bargaining unit members, such as Coles, are governed by a collective bargaining agreement with the Union. DMW contends that plaintiff's claim that it violated § 1981 by not following its policies, despite such express disclaimers is entirely specious.

17

Plaintiff's argument in response is difficult to follow.  He says "Plaintiff is a

African/American Black Man who filed his complaint under Title 42 U.S.C.

Section 1981 alleging Race Discrimination and Retaliation in Dearborn Midwest

Company's breach of Plaintiff's right to make and enforce contracts under a

binding unilateral policy employee has rights under, Age Discrimination in

Employment Act (ADEA), and Defamation of Character."  (Dkt. 39, Pg ID 1009).

Plaintiff also contends:

> Where it states in employer's policy Section 1-1
> Introduction "DMW reserves the right to deviate from
> any policy in any particular case, Dearborn Midwest
> Company agents did deviate from public policy after
> Plaintiff reported Race Discrimination, Hostile Work
> Environment, and Age Discrimination, and Sexual
> Harassment to CEO Rosati on January 23, 2013 the
> deviation was permanently removing plaintiff from his
> regularly assigned duties as the CNC Operations
> personnel on February 4, 2013 in breach of the right to
> make and enforce contracts under Section 1981 (a), (b),
> where employer policy cites no retaliation will be taken
> against an employee for coming forward and where
> DMW exclusive exceptions statement against the breach
> of public policy."

(Dkt. 39, Pg ID 1013).  Coles also asserts that he is not seeking a cure all solution,

but he is seeking "a solution to the breach of the right to make and enforce

contracts which Coles has exclusive rights under."  (Dkt. 39, Pg ID 1037).

Plaintiff goes on to seemingly argue that his position with DMW conferred him

rights under the unilateral policy, which plaintiff followed, but then DMW

18

breached "plaintiff's exclusive right to make and enforce contracts in the

performance of its duty under the expressed written terms and conditions of

employment under defendant's policy M4-2 where plaintiff was performing his

daily job functions with the highest integrity..."  (Dkt. 39, Pg ID 1038).  In his own

motion for summary judgment, with respect to his § 1981 claim, plaintiff asserts:

> That defendant employer failed in the performance of
> their fiduciary duty of enforcing the unilateral policy
> once employee made known the unlawful acts therefore
> breaching plaintiff's right to make and enforce contracts
> under 42 U.S.C. Section 1981 (a) (b) (c) in an adverse
> employment decision by and through retaliation in
> removing plaintiff from his regular assigned job duties as
> the CNC Operations personnel operating DMW's Laser,
> and denial of CNC Training, and Fabricator training
> starting on February 4, 2013.

(Dkt. 40, Pg ID 1060).

Title 42 U.S.C. § 1981 provides in pertinent part that "all persons within the

jurisdiction of the United States shall have the same right in every State and

Territory to make and enforce contracts ... as is enjoyed by white citizens...."

Section 1981 thus prohibits racial discrimination in the making of contracts and

affords a federal remedy against racial discrimination in private employment.

*Johnson v. Ry. Express Agency, Inc*., 421 U.S. 454, 460-61 (1975).  As explained

in *Getachew v. Central Ohio Transit Authority*, 2012 WL 1575997, *2 (S.D. Ohio

2012), in 1989, the Supreme Court held that while the "make and enforce

19

contracts" language of Section 1981 proscribed discriminatory hiring, it did not proscribe discriminatory termination or other discriminatory actions occurring after the employment relationship was formed. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 177-78 (1989). "In the wake of *Patterson*, Congress passed the Civil Rights Act of 1991, which amended § 1981 by designating its original text, quoted above, as subsection (a) and by adding a new subsection (b) to define the term 'make and enforce' contracts to include 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Anthony v. BTR Auto. Sealing Sys.*, 339 F.3d 506, 512 (6th Cir. 2003) (citing 42 U.S.C. § 1981(b)). This amendment reversed *Patterson* and "permitted the use of § 1981 to challenge alleged race discrimination not only in the formation of the employment relationship, but in 'post-formation' employment actions as well." *Getachew*, at *3.

As explained in *Brintley v. St. Mary Mercy Hospital*, 904 F.Supp.2d 699, 722 (E.D. Mich. 2012), state law governs as to whether a contract exists between the parties under § 1981. *See Talwar v. Catholic Healthcare Partners*, 258 Fed.Appx. 800, 803 (6th Cir. 2007), cert. denied, 555 U.S. 1035 (2008). And, where no cognizable contract between the parties exists under Michigan law, a § 1981 claim fails as a matter of law. *Brintley*, 904 F.Supp.2d at 722-723. Under

20

Michigan law, a valid contract requires parties competent to contract, a proper

subject matter, legal consideration, and mutuality of agreement and obligation. *Id.*

at 720, n. 17, citing *Feyz v. Mercy Memorial Hospital*, 2010 WL 23692 (Mich.

App. 2010), citing *Thomas v. Leja*, 187 Mich. App. 418, 422; 468 N.W.2d 58

(1991). In this case, it is clear that plaintiff is not making a § 1981 claim based on

the collective bargaining agreement. Rather, his § 1981 claims are based solely on

DMW's policy manual.

DMW's policy manual provides, in pertinent part, that none of its policies

are intended to create a contract with employees governed by it:

> The policies and procedures outlined in this Manual are
> designed to guide Dearborn Mid-West's (hereafter
> referred to as DMW) management staff and to inform
> them of various policy and procedural requirements in
> the administration of personnel matters. Policies and
> procedures covered by union contracts supersede the
> policies and procedures stated here for the covered
> employee group(s). Except for those policies and
> procedures governed by union contracts, the policies and
> procedures outlined in this Manual supersede and
> replace all prior handbooks, manuals, policies and
> procedures, whether written or oral.
>
> It is obviously not possible to anticipate every situation
> that may arise in the workplace or to provide information
> that answers every possible question. In addition,
> circumstances will undoubtedly require that the policies,
> practices, and benefits described in this Manual be
> changed from time to time. **Thus, with the exception of
> policies required by law, which cannot be changed,
> DMW reserves the right to modify, supplement,**

> **rescind or revise any provision of this Manual from time to time as it deems necessary or appropriate in its discretion. No employee should have an expectation that policies and procedures contained in this Manual shall become a right associated with employment.**
>
> **Nothing contained in this Manual is to be interpreted as or implied to be a contract of employment. For those represented by Local Union 508, the employment relationship is covered in the "Bargaining Agreement" between the Union and Dearborn Mid-West Conveyor Co.**
>
> **DMW reserves the right to deviate from any policy in any particular case.**

(Dkt. 29-5, Pg ID 792) (emphasis in original).  The language in the policy manual could not be clearer - no contract is created by any provisions contained therein. Under Michigan law, an employee cannot have any reasonable expectation that a policy manual vested him or her with any kind of contract rights when the policy contains such a clear and express disclaimer of contractual rights.  *See e.g.*, *Adams v. Ford Motor Co.*, 847 F.Supp. 1365, 1376 (E.D. Mich. 1994); *Paula v. Zenith Data Systems Corp.*, 1994 WL 854239, *4 (W.D. Mich. 1994) ("Where an employer expressly declares that its policy statements do not form an employment contract, an employee may form no legitimate expectation of a just cause employment.") (applying Michigan law); *Heurtebise v. Reliable Bus. Computers, Inc.*, 452 Mich. 405, 414; 550 N.W.2d 243 (1996) (Where employee handbook

22

contained an express disclaimer that it did not create a contract, and that the employer reserved the right to modify the policy in its sole discretion, the policy did not create an enforceable contract).  Given that the policy manual did not create any contract, plaintiff's § 1981 claims fail as a matter of law.  *See Brintley*, *supra*.

   C.   Hostile Work Environment Claim

   According to DMW, a hostile work environment claim under § 1981 is subject to the same standards as a like claim brought under Title VII.  *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).  To establish a hostile work environment claim, DMW says that Coles must show: 1) he is a member of a protected class; 2) he was subject to unwelcome harassment; 3) the harassment was race-based; 4) the harassment unreasonably interfered with his work performance by creating an environment that was intimidating, hostile, or offensive; and 5) DMW was liable for the harassing conduct.  *Kuhn v. Washtenaw County*, 709 F.3d 612, 627 (6th Cir. 2013).  Harassing conduct "must be extreme to amount to a change in the terms and conditions of employment.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 778; 118 S.Ct. 2275 (1998).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not create a hostile work environment.  *Id*.; *see also Armstrong v. Whirlpool Corp.*, 363 Fed. Appx. 317, 327 (6th Cir. 2010) (Court affirmed summary judgment on

23

plaintiff's hostile working environment claims involving "a handful of uses of the n-word and its derivatives…some racist jokes…, a few references to the Ku Klux Klan and James Earl Ray," and the presence of racist graffiti that was removed after the plaintiff reported it).  An employer can avoid liability for such harassment if, after receiving notice of the harassment, it takes prompt remedial action. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher*, *supra*, at 808.  In evaluating a hostile work environment the Court must consider the totality of the circumstances.  *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 715 (6th Cir. 2012).  DMW also relies on a recent Sixth Circuit decision, *Nicholson v. City of Clarksville, Tenn.*, 530 Fed. Appx 434 (6th Cir. 2013), which addressed claims of racial discrimination under § 1981 (and Title VII) which included hostile work environment, as well as retaliation for complaining about discrimination.  The plaintiff in *Nicholson* alleged that over the course of two years:

> 1) An employee called another employee a "n-lover";
> 2) A co-worker called him "boy" on one occasion;
> 3) A supervisor referred to a black co-worker as "blue";
> 4) A co-worker on one occasion sang along with a song on the radio which contained the n-word (and stopped doing so after the plaintiff objected).

The Sixth Circuit expressly ruled that "[t]hese four isolated instances over the course of two years, while inappropriate and offensive, are not so severe and

pervasive as to alter the terms and conditions of [plaintiff's] employment." *Id*. Consequently, the Sixth Circuit affirmed summary judgment for the employer. *Id*.

According to DMW, the same result is required here. DMW asserts that when plaintiff was asked to identify the racial slurs he claims created a hostile work environment, he only could identify the use of the word "boy" on one occasion and being called "lazy" on one other occasion by a white employee; being told to let a "young buck" perform a job task by another black employee on a single occasion (all of which he reported and did not recur) and being called "Grady" (which Plaintiff interpreted as a reference to a black TV character on Sanford and Son), a "black Fred Sanford" and being called "boy" on single occasions by three other white employees (none of which he reported). According to DMW, even if all of these isolated remarks are construed as race-based, under the totality of the circumstances, they cannot be considered so severe and pervasive as to alter the conditions of Coles' employment. This is especially true where, as here, after Coles complained of these events there were no recurrences.

Again, plaintiff's response is rather convoluted and difficult to follow. He does not seem to address the merits of the legal arguments raised by DMW. Rather, his response brief focuses on recounting the instances of claimed harassment. The same appears to be true of his motion for summary judgment, which is also very difficult to follow.

25

Under the hostile work environment theory, in order to survive summary judgment, plaintiff must establish that:  (1) he is a member of a protected class ([African-American]), (2) he was subjected to harassment, either through words or actions, based on [race], (3) the harassment had the effect of unreasonably interfering with his work performance and creating an objectively intimidating, hostile or offensive work environment; and (4) there exists some basis for liability on the part of the employer.  *Grace v. Uscar*, 521 F.3d 655, 678 (6th Cir. 2008), citing *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 49 (6th Cir. 1996).  Moreover, "[t]he harassment must meet both an objective and a subjective test, 'in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to a reasonable person and the actual victim.'" *Id*., quoting *Randolph v. Ohio Dep't of Youth Svcs.*, 453 F.3d 724, 733 (6th Cir. 2006).  Factors to consider in determining whether a hostile work environment actually exists include, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.*, quoting *Harris v. Forklift Sys.*, *Inc.*, 510 U.S. 17, 23 (1993) (emphasis omitted).  In addition, "courts must determine whether the 'workplace is permeated with 'discriminatory intimidation, ridicule and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment

26

and create an abusive work environment.'" *Id.* at 678-679, quoting *Harris*, at 21 (internal citations omitted).  Failure to establish a *prima facie* case is grounds to grant a defendant summary judgment.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989).

Once a hostile work environment is established, an employee alleging sexual harassment by a coworker must still establish that the employer is liable because it knew or should have known of the harassment, yet failed to take prompt and appropriate corrective action.  *EEOC v. Harbert-Yeargin, Inc.,* 266 F.3d 498, 518 (6th Cir. 2001).  This Sixth Circuit held in *Blankenship v. Parke Care Ctrs*., Inc., 123 F.3d 868 (6th Cir. 1997),[4] that when coworker harassment is at issue, an employer is liable "if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Id.* at 872-73.

The undersigned concludes that the alleged harassment described by

---

[4] In *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 338 (6th Cir. 2008), the Sixth Circuit observed that *Blankenship* was modified by the Supreme Court's decisions in *Faragher v. City of Boca Raton*, 524 U.S. 775, 780, 807 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 758-59 (1998), it remained good law for the proposition that a company may be held liable for coworker harassment if its "response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Blankenship*, 123 F.3d at 873; *see also Collette v. Stein-Mart, Inc.*, 126 Fed.Appx. 678, 684 n. 3 (6th Cir. 2005) (noting that *Blankenship's* suggestion that "mere negligence" is insufficient to establish employer liability was overruled by *Ellerth/Faragher* and suggesting that, post-*Ellerth/Faragher*, "an employer may be held liable when its remedial response is merely negligent, however well-intentioned"); *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829 (6th Cir. 1999) (holding that, post-*Ellerth/Faragher*, the standard for coworker harassment is negligence, but applying *Blankenship* to define negligence as an employer response that "manifests indifference or unreasonableness in light of the facts").

27

plaintiff was not sufficiently severe or pervasive.  While plaintiff believes the harassment he suffered was because of his race, that simply does not create an issue of fact.  While it may satisfy the subjective prong of the hostile work environment test under *Harris v. Forklift Systems*, it does not, in and of itself, create a material issue of fact because plaintiff must also satisfy the objective prong of that test, which requires an environment sufficiently severe or pervasive so as to create the type of environment that a reasonable person would find it to be hostile or abusive.  While there is no magic number of incidents that must occur within a certain period of time, when comparing the conduct of which plaintiff complains to those in this Circuit where a hostile work environment was found to exist, plaintiff's claim simply comes up short.  For example, in *Clay*, the Sixth Circuit concluded that 15 incidents over a two-year period was not sufficiently pervasive.  The incidents recounted in *Clay* were far more severe and pervasive than those identified by plaintiff.[5]  *See also Clay*, 501 F.3d at 708, comparing

_____

[5] In *Clay*, plaintiff alleged that: her supervisors had prevented her from applying and obtaining certain job positions; adversely transferred her to an undesirable shift; assigned to her job duties that she was not physically capable of performing and not qualified for, requiring very heavy lifting, ultimately leading to a groin injury; criticized her for eating during work, for leaving her work station to get a cup of coffee, for using the bathroom at the end of her break, and for the size of her earrings; assigned her tasks outside of her job description; falsely accused her of taking boxes while on company time; while she was on leave for the groin injury, someone cut the lock on her desk, removed supplies, and placed them in a box, although a white co-worker was able to store his supplies in a locked desk drawer; accused her, in front of other employees, of standing around on the job because she ate a doughnut while waiting for a coworker who asked for her assistance; criticized her for the route she took, but did not chastise her white co-workers who took the same route and had her timed to record how long it took her to get to her work station.

28

*Jordan v. City of Cleveland*, 464 F.3d 584, 598 (6th Cir. 2006) (conduct was sufficiently severe or pervasive when for over ten years plaintiff was exposed to racial slurs, demeaning jokes, and inflammatory graffiti, experienced "isolation and segregation" and "disparate discipline and additional duties.") with *Burnett v. Tyco Corp.*, 203 F.3d 980, 984-85 (6th Cir.), *cert. denied*, 531 U.S. 928 (2000) (three sexually offensive remarks made by the plaintiff's supervisor at the beginning and end of a six-month period did not constitute pervasive discriminatory conduct). Here, the conduct alleged does not satisfy the objective prong and thus, summary judgment in favor of DMW on plaintiff's § 1981 racial harassment claim should be granted.

  D. <u>Plaintiff's Retaliation Claim</u>

  To establish a prima facie case of retaliation, a plaintiff must demonstrate by a preponderance of the evidence that: 1) he engaged in protected activity; 2) the protected activity was known to the Company; 3) DMW took adverse employment action against Coles; and 4) there was a causal connection between the adverse employment action and the protected activity. *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013). To prevail on a claim under the ADEA, it is not sufficient for the plaintiff to show that age was a motivating factor in the adverse action; rather, the ADEA's "because of" language requires that a plaintiff "prove by a preponderance of the evidence (which may be direct or circumstantial) that age

was the 'but-for' cause of the challenged employer decision." *Lee v. City of Moraine Fire Dep't*, 2015 WL 914440, at *9 (S.D. Ohio Mar. 2015), quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009), citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141-43, 147 (2000). For an employer to take an adverse action "because of age" means "that age was the 'reason' that the employer decided to act." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, — U.S.—, 133 S.Ct. 2517, 2527 (2013), quoting *Gross*, 557 U.S. at 176 (extending *Gross* to retaliation claims under Title VII). Thus, regardless of the underlying legal theory – Title VII, § 1981, or the ADEA – Coles must show that an adverse employment action was taken based on an unlawful motive.

According to DMW, Coles has not suffered any adverse employment action, much less any unlawful adverse employment action, in retaliation for his complaints to DMW. Coles testified that he was assigned to perform work tasks other than operating the laser machine. Coles also admitted that he could not become a Fabricator 1, which he wanted to become, merely by operating the laser machine. And, after he expressed his interest in becoming a Fabricator 1, he was assigned to work with a Fabricator 1. Yet, DMW points out that Coles says he was retaliated against by not being assigned to operate the laser machine. According to DMW, this is illogical and nonsensical. Notably, DMW points out that plaintiff was assigned to perform bargaining unit work under the labor

30

contract between DMW and the Union, which represents Coles.

DMW maintains that the same is true regarding Coles' claim that his Fabricator 1 "training" unlawfully was discontinued by DMW on October 2, 2013, when he was assigned to perform welding work. Coles admitted that he never was told that his "training" was being discontinued. He further admitted that, at the time of his deposition, he was working with a Fabricator 1. DMW points out that Coles testified that he has no idea if his current work with a Fabricator 1 is considered Fabricator 1 training. Thus, according to DMW, to say Coles' claims that he has been subjected to adverse employment action are specious is an understatement. DMW urges the Court to reject Coles' efforts to have this Court rule on his job assignments within his bargaining unit.

In response, Coles contends that, "as a result of reporting race discrimination, age discrimination, sexual harassment, and hostile work environment in a formal complaint on January 23, 2013 employer did implement an adverse employment decision against Plaintiff's by the permanent removal from official duty as the CNC Operations personnel employer did retaliate against employee based upon Plaintiff filing an internal complaint within the company policy of reporting to management and under Management Responsibility in company policy under Section M2-1 which defendant's did deliberately omit from their exhibits." (Dkt. 39, Pg ID 1010). He also asserts that "made a second report

31

of race discrimination, age discrimination, sexual harassment, and a hostile work environment on January 23, 2013, and plaintiff was retaliated against on January 26, 2013 and February 4, 2013 in less than a year plaintiff has gone through these turn of events, and where defendants claims plaintiff fails to report; it is because management is hostile against plaintiff, and generally participates in the hostility so plaintiff has to be extremely careful of how and when to report." (Dkt. 39, Pg ID 1031).

According to Coles, he "did everything to see DMW achieve its success even among the hostile work environment that was happening, but once Coles reported management and employees on January 23, 2013, management decided it would retaliate against Coles by removing him permanently from his assigned duties in order to teach Coles a lesson in not reporting anything that happens inside the walls of DMW, and because of the retaliation plaintiff loss out on the crucial CNC training he had been inquiring about since June of 2012 when he showed Johnson that every operator must be properly trained, and when the training was available Mitchell refused to allow Coles any of the training, even to the point he failed to allow Coles any training if Coles reported anything to him or management, whereas on February 4, 2013 Coles was under protected activity even on January 26, 2013 when Coles received the derogatory time slip." (Dkt. 39, Pg ID 1046).  Next plaintiff claims that he lost out "on the difference in the

32

overtime and double time pay of the CNC position where the laser is most needed to stay ahead of the Fabricators in order to maintain this objective the laser will be scheduled odd hours of overtime and double time increasing the pay scale at the end of the year which Coles lost out on based on the continued retaliation."  (Dkt. 29, Pg ID 1047).  Coles also asserts that he "must stress and reiterate on February 4, 2013 there was no deficiency in employee's job duties as the CNC Operations personnel or on October 2, 2013 in employees' training to become a Fabricator 1 the employer acted in an materially adverse employment decision in retaliation for Coles' reporting of acts against the public policy statement outlined in its manual which DMW did intend to enforce which it failed to do so by taking sides with the known harassers because management did openly participate and took part in the unlawful acts with its employees once Coles made known of the violations occurring against him whether it was race discrimination, age discrimination, sexual harassment, a hostile work environment, it all accumulated to retaliation and the loss of Coles' CNC Operation position, denial of CNC Operations training by a skilled Mazak Laser Technician and denial and removal from the Fabricator 1 training based on reporting to DMW management in breach of the right to make and enforce contracts."  (Dkt. 29, Pg ID 1050).

In the view of the undersigned, Coles' retaliation claims must fail because he identifies no adverse employment action taken against him.  DMW correctly

points out that plaintiff admittedly was not assigned any different duties than any other employee in the Fabricator 2 classification. He also offers no evidence that he was removed from training as a Fabricator 1, even testifying that, as of the time of his deposition, he continued to work with a Fabricator 1, which the unrebutted evidence establishes is how a Fabricator 2 is trained to become a Fabricator 1.

The remainder of Coles' retaliation claim seems to focus on the alleged loss of the CNC operator position. In the view of the undersigned, even if plaintiff was no longer tasked with operation of the CNC, this is not an adverse employment action, as the evidence shows that this was but one work assignment within the Fabricator 2 job classification. Plaintiff filed a grievance to petition the addition of a CNC Operator classification with a pay scale different from that of the Fabricator 2 class. (Dkt. 29-9). Mitchell responded to this grievance on January 22, 2013, stating that operation of this equipment was appropriate within the Fabrication 2 classification, acknowledged Coles' personal efforts, which were recognized by an early acceleration to the top of the pay scale. (Dkt. 29-9). According to the DMW memorandum dated January 30, 2013 in response to Coles' grievance, the matter was considered closed since the issue was not taken to the next level in the grievance process. Given that plaintiff acknowledges that he was not given any tasks outside the scope of the Fabricator 2 job classification and the unrebutted evidence that operation of the CNC machine was a job that

34

falls within the Fabricator 2 job classification, the undersigned fails to see any adverse employment action taken against plaintiff.

> ### E.   Collateral Estoppel

Collateral estoppel precludes re-litigation of an issue in a subsequent, different cause of action if: 1) the issue in the subsequent litigation is identical to that resolved in the earlier litigation; 2) the issue was actually litigated and decided in the prior action; 3) the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation; 4) the party to be estopped was a party to the prior litigation (or in privity with such a party); and 5) the party to be estopped had a full and fair opportunity to litigate the issue. *Hammer v. I.N.S.*, 195 F.3d 836, 840 (6th Cir. 1999). Federal courts can apply collateral estoppel to determinations made by the National Labor Relations Board. *Olchowik v. Sheet Metal Workers' International Associations*, 875 F.2d 555, 557 (6th Cir. 1989).

DMW contends that the elements for collateral estoppel are satisfied in this case. Coles filed his unfair labor practice charge with the NLRB on March 28, 2013, he alleged that he suffered retaliation for filing grievances (concerning his discrimination claims) with DMW. The NLRB determined that there was no retaliation against Coles for filing his complaints with DMW. According to DMW, Coles is attempting to re-litigate that very same issue, under a different

35

legal theory.  DMW contends that Coles' new legal theory does not change the fact that there was a determination that he suffered no retaliation for filing complaints, prior to March 28, 2013, with DMW and that ruling bars his claims of retaliation he says occurred following his January 2013 complaint to DMW and before March 28, 2013, the date he filed the NLRB charge.  DMW maintains that the only "retaliation" plaintiff says occurred after March 28, 2013 involves his alleged failure to be trained as a Fabricator 1 and having to perform the same "menial tasks" as his co-workers, which are neither true nor unlawful.

        In the view of the undersigned, DMW overstates the preclusive effect of the NLRB decision in this case.  As the Sixth Circuit explained *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 586 (6th Cir. 1994), other circuits have "uniformly rejected the suggestion that an NLRB decision that did not result from an adjudicatory hearing should be given preclusive effect."  In adopting this rule for this Circuit, the Court first turned to *Warehousemen's Union Local No. 206 v. Continental Can Co.*, 821 F.2d 1348 (9th Cir. 1987), in which the Ninth Circuit held that "the NLRB's refusal to issue a complaint does not act as res judicata ... [and] no collateral estoppel effect attaches to such refusal."  *Id*. at 1351 (citations omitted).  The Court next turned to the First Circuit, which also concluded that "the Regional Director's refusal to issue a complaint does not collaterally estop the charging party from litigating the matter in a later suit under section 301." *Citizen*

36

*Co. v. Boston Electrotypers Union No. 11*, 702 F.2d 273, 277 n. 6 (1st Cir. 1983). The Sixth Circuit then turned to its own decision in *Olchowik v. Sheet Metal Workers' Int'l Ass'n*, 875 F.2d 555, 557 (6th Cir. 1989) (a case relied on by DMW), finding that its reasoning "likewise dictates that no preclusion attaches." In *Olchowik*, the Sixth Circuit reasoned that "a factual determination by the NLRB in an action under the NLRA may preclude a federal court, hearing a case under the LMRDA, from considering renewed dispute about that fact." The *Black* Court then observed that in *Olchowik*, the court  proceeded to conclude that an earlier factual determination by the NLRB did not have preclusive effect in its case, because of "the classic test for issue preclusion." *Id*.  Indeed, the *Black* Court observed that in *Olchowik*, the court concluded that none of the three steps for collateral estoppel "is satisfied in a case where the NLRB simply refused to issue a complaint after an administrative investigation." *Black*, 15 F.3d at 586. Therefore, in *Black*, the Sixth Circuit concluded that no preclusive effect should be given to the NLRB documents.

Here, DMW relies on the "dismissal" of plaintiff's charge by the NLRB. (Dkt. 29-13).  However this "dismissal" is not the result of an adjudication by an administrative law judge after a hearing.  Rather, this is merely a refusal by the Regional Director to issue a complaint, as clearly explained in the Unfair Labor Practice Process Chart which can be found on the NLRB website.  *See*

http://www.nlrb.gov/resources/nlrb-process/unfair-labor-practice-process-chart.

As explained in this chart, the refusal to issue a complaint (which has no

preclusive effect under binding Sixth Circuit law), is the same as a dismissal. *Id*.

Thus, the NLRB decision has no preclusive effect on this case.

    F.    <u>Defamation</u>

The elements of a cause of action for defamation under Michigan law are: 1)

a false and defamatory statement concerning the plaintiff, 2) an unprivileged

publication to a third party, 3) fault amounting at least to negligence on the part of

the publisher, and 4) either actionability of the statement irrespective of special

harm (defamation *per se*) or the existence of special harm caused by the

publication (defamation *per quod*). *Burden v. Elias Bros. Big Boy Rests*., 240

Mich.App. 723, 726, 613 N.W.2d 378 (2000).  To properly state a claim for

defamation, the plaintiff must "plead precisely the statements about which [he]

complain[s]." *Royal Palace Homes, Inc. v. Channel 7 of Detroit, Inc.*, 197

Mich.App. 48, 57, 495 N.W.2d 392 (1992).  A communication is defamatory if it

tends to harm the reputation of another so as to lower that person in the estimation

of the community or deter third persons from associating or dealing with that

person. *Glazer v. Lamkin*, 201 Mich. App 432, 438; 506 N.W.2d 570 (1993).

Coles claims that some unknown person wrote "faggit queer" on one of his

time sheets.  According to his deposition testimony, he has no idea who did that.

He asserts that DMW is liable for this slur because it did not do enough to track down the author (and, presumably, punish him). According to DMW, this is not a basis for liability. Now, plaintiff contends that defendant Mitchell must have written the slur because of his tendency to misspell words and the proximity of his office to the time sheet rack.

Plaintiff sought to amend his response to the motion for summary judgment to include his theory regarding why Mitchell must be the culprit, which was denied by the Court. (Dkt. 88, 94). The Court concluded that plaintiff had not shown good cause to amend his response at such a late stage of the proceeding. (Dkt. 94). In addition, the Court noted that plaintiff's newly proffered theory contradicts his deposition testimony, wherein he testified that he did not know the identity of the person who wrote on his time card. The Court concluded that in order to provide evidentiary support for his new theory in a supplemental response to the motion for summary judgment, plaintiff would have to submit a supporting affidavit. However, a party cannot submit an affidavit that contradicts the parties' earlier sworn testimony in order to create a genuine issue of fact sufficient to survive summary judgment, unless the party explains the contradiction or resolves the disparity. *Aerel*, *S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 906-08 (6th Cir. 2006), quoting *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). The Court concluded that Coles had not satisfactorily done so in his motion. (Dkt.

39

94).

While Coles was not permitted to raise this new theory in response to DMW's motion for summary judgment, he did raise it in his own motion for summary judgment.  (Dkt. 40).  Notably, however, Coles new theory is not supported by any affidavit, let alone any affidavit that sufficiently explains the contradictions between his new "theory" and his deposition testimony.  Thus, even if Coles could otherwise maintain a defamation claim based on slur written on time sheet, there is no evidence in this record suggesting that any of the defendants published the statement in question, or were negligent or at fault for such publication.  Thus, summary judgment in favor of defendants on Coles' defamation claim is warranted.

G.    Motion for Rule 11 Sanctions

Federal Rules of Civil Procedure 11(b) states that, by filing a "pleading, written motion, and other paper" with the court, an attorney or an unrepresented party is certifying that "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... [,] the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."  *Michigan Division-Monument Builders of North America v. Michigan Cemetery Ass'n*, 524 F.3d 726, 738-739 (6th Cir. 2008), quoting

Fed.R.Civ.P. 11(b).  "[I]n this circuit, the test for the imposition of Rule 11 sanctions is whether the individual attorney's conduct was reasonable under the circumstances."  *Id*. at 739, quoting *Mann v. G & G Mfg., Inc.*, 900 F.2d 953, 958 (6th Cir. 1990).  The test of reasonableness under the circumstances is an objective standard.  *Century Prods., Inc. v. Sutter*, 837 F.2d 247, 253 (6th Cir. 1988).  This objective standard is intended to eliminate any "empty-head pure-heart" justification for patently frivolous arguments.  *Nieves v. City of Cleveland*, 153 Fed.Appx. 349, 353 (6th Cir. 2005).

Rule 11 "stresses the need for some prefiling inquiry into both the facts and the law to satisfy the affirmative duty imposed by the rule."  *Albright v. Upjohn*, 788 F.2d 1217, 1221 (6th Cir. 1986).  A good-faith belief in the merits of a case is insufficient to avoid Rule 11 sanctions.  *Mann*, 900 F.2d at 958.  Sanctions are mandatory in the event that the court determines that Rule 11 has been violated, but the court has "wide discretion" in delineating the extent of the sanctions imposed.  *Albright*, 788 F.2d at 1222.  "The standard for sanctioning parties is the same as that for counsel: reasonableness under the circumstances per Rule 11, or 'in bad faith, vexatiously, wantonly, or for oppressive reasons' under this Court's inherent sanctioning power."  *Adams v. Penn Line Services, Inc.*, 2009 WL 1514605, *4 (N.D. Ohio 2009).  Rule 11(c) provides, "[i]f, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been

41

violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed.R.Civ.P. 11(c)(1). *Pro se* plaintiffs are not exempt from Rule 11 sanctions simply because they are not represented by counsel. *Graham v. Liberty Mut. Ins. Co.*, 2009 WL 1034942, *4 (E.D. Tenn. 2009), citing *Bus. Guides, Inc. v. Chromatic Communs. Enters.*, 498 U.S. 533, 564 (1991) ("Requiring *pro se* litigants to make the Rule 11 certification ensures that, in each case, at least one person has taken responsibility for inquiry into the relevant facts and law."); *see also Kaye v. Acme Investments, Inc.*, 2008 WL 4482304, *1 (E.D. Mich. 2008) ("Pro se litigants must comply with Rule 11 no less than attorneys, and must make a reasonable inquiry as to whether the pleading in question is well-grounded in fact and warranted by existing law."). The primary purpose of Rule 11 sanctions is to deter future conduct of a like nature. *Kaye*, at *1. Notably, a plaintiff's intentional misrepresentation on the record is serious misconduct warranting dismissal as a sanction. *Amadasu v. General Revenue Corp.*, 2008 WL 207936, *5 (S.D. Ohio 2008).

In the circumstances of this case, undersigned suggests that Rule 11 sanctions should not be imposed on plaintiff. While some of Coles' claims were arguably frivolous, including his § 1981 claims based on DMW policies that clearly and expressly disclaimed any contractual rights, other claims were not so obviously frivolous. For example, plaintiff's hostile work environment claims,

42

while on somewhat legally shaky ground because only an ADEA claim and not a Title VII claim was asserted in the complaint, factually such claims were not completely frivolous.  And, while the hostile work environment and retaliation claims ultimately have been deemed without merit, they are not so meritless as to be frivolous, in the view of the undersigned.  Moreover, the undersigned also notes that DMW's own collateral estoppel theory stands on rather legal shaky ground as well.  Based on the foregoing, the undersigned suggests that plaintiff did not violate Rule 11 and sanctions are not warranted.

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that defendants' motion to dismiss or for summary judgment be **GRANTED**, that plaintiff's motion for summary judgment be **DENIED**, and that defendants' motion for Rule 11 sanctions be **DENIED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: March 9, 2015                    s/Michael Hluchaniuk
                                       Michael Hluchaniuk
                                       United States Magistrate Judge

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 9, 2015, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record and that I have mailed by U.S. Postal Service to the following non-ECF participant: Gayland Brion Coles, 16801 Bringard, Detroit, MI 48205.

<u>s/Tammy Hallwood</u>
Case Manager
(810) 341-7887
tammy_hallwood@mied.uscourts.gov